UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN

---

BANK OF LAKE MILLS,

                 Plaintiff,

     v.

FREEDOM STORES, INC.
MILITARY CREDIT SERVICES, LLC,
JOHN F. MELLEY, and
LEONARD B. MELLEY,

                 Defendants.

Case No. 3:19-CV-00115-jdp

---

## FIRST AMENDED COMPLAINT

---

Plaintiff Bank of Lake Mills ("BLM"), through its attorneys, Godfrey & Kahn, S.C., as and for its First Amended Complaint against Defendants Freedom Stores, Inc. ("Freedom"), Military Credit Services, LLC ("MCS"), John F. Melley ("John Melley"), and Leonard B. Melley ("Leonard Melley"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      This is an action by BLM for breach of contract arising out of Freedom's and MCS's deceptive marketing of loans and services and failure to comply with applicable law in connection with loans originated by the bank. Their failure to perform under the parties' agreement triggered guaranty obligations of the companies' owners, John and Leonard Melley, who have failed to honor those obligations. BLM also brings claims for misrepresentation against Freedom and MCS arising out of false representations they made to BLM.

## PARTIES AND JURISDICTION

2.      Plaintiff Bank of Lake Mills is a Wisconsin state-chartered bank whose principal place of business is located at 136 East Madison Street, Lake Mills, Wisconsin, 53551.

3.      Upon information and belief, Defendant Freedom Stores, Inc. is a Delaware corporation with its principal place of business located at 1150 East Little Creek Road, Norfolk, Virginia 23518.  On or about August 15, 2017, Freedom was dissolved.  However, under 8 Del. C. § 278, Freedom "shall be continued, for the term of 3 years from such . . . dissolution . . . for the purpose of prosecuting and defending suits."

4.      Upon information and belief, Defendant Military Credit Services, LLC is a Virginia limited liability company with its principal place of business located at 1150 East Little Creek Road, Norfolk, Virginia 23518.

5.      Upon information and belief, Defendant John F. Melley is an adult resident of the state of Virginia residing at 1756 Templeton Lane, Virginia Beach, Virginia 23454.  At all times relevant to this Complaint, John Melley was an owner of both Freedom and MCS, the vice president and chief operating officer of Freedom, and the president and chief executive officer of MCS.

6.      Upon information and belief, Defendant Leonard B. Melley is an adult resident of the state of North Carolina residing at 18 Elkton Drive, Pinehurst, North Carolina 28374.   At all times relevant to this Complaint, Leonard Melley was an owner of both Freedom and MCS, the president and chief executive officer of Freedom, and the chief operating officer of MCS.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1), because BLM and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## FACTUAL BACKGROUND

8.      Organized in 1893, BLM is a Wisconsin state-chartered bank that has been in the business of providing banking and financial services to its customers for 125 years.  Among other serves, BLM originates closed-end consumer installment loans.

9.      John and Leonard Melley owned and operated Freedom, a nationwide retailer of consumer goods and electronics that sold its products both online and at retail stores, primarily targeting current and former members of the United States military and their families.  Freedom financed its customers' retail purchases through retail-installment contracts.

10.     On or about August 14, 2013, BLM and Freedom entered into a certain Loan Program Agreement (the "Program Agreement"), which BLM and Freedom amended and restated several times, including on February 13, 2015, March 25, 2015, and May 14, 2015. Under the Program Agreement, BLM and Freedom agreed that BLM would originate closed-end installment loans to Freedom's retail customers, and that Freedom would market the loans to its retail customers and service any loans originated under the Program Agreement (the "Program").

11.     Freedom subcontracted certain services under the Program Agreement to its affiliates, including MCS, which was also owned and operated by John and Leonard Melley. MCS performed certain marketing, processing, and other services, including operating an internet website through which consumers could obtain closed-end consumer loans under the Program.

12.     Under the March 25, 2015 amendment, MCS became a party to the Program Agreement, effective as of August 14, 2013. The amendment also provided that Freedom had full responsibility for the acts and omissions of MCS and any other third-party entities hired or retained by Freedom to perform services under the Program Agreement.

13.     Concurrent with the execution of the Program Agreement, on August 14, 2013, BLM entered into two separate Guaranty Agreements (each, a "Guaranty Agreement") with John and Leonard Melley, in which John and Leonard Melley each personally guaranteed the full and prompt payment and performance of Freedom under the Program Agreement.

14.     John and Leonard Melley also both signed the March 25, 2015 amendment to the Program Agreement, acknowledging and agreeing to its terms and further acknowledging and agreeing that MCS was deemed an obligor for purposes of the Guaranty Agreements.  John and Leonard Melley thereby personally guaranteed the full and prompt payment and performance of MCS under the Program Agreement.

15.     Further, as guarantors, John and Leonard Melley were also responsible and contractually obligated to ensure Freedom and MCS complied with all applicable laws and regulations in performing under the Program Agreement.

16.     Pursuant to Section 2(d) of the Program Agreement, as added by the March 25, 2015 amendment, Freedom agreed that it "shall be solely responsible for ensuring that the Marketing Materials [used in the Program] comply with all Applicable Laws.  [Freedom] shall ensure that any Affiliates or third-party service providers engaged by [Freedom] to perform any services on behalf of [Freedom] in connection with the marketing and solicitation of the Program and the Loans comply with all Applicable Laws."

17.     Pursuant to Section 4 of the Program Agreement, Freedom and MCS agreed that they would ensure that all "documents, terms, and procedures" ("Consumer Documents") to be used by BLM in the Program would "comply with all Applicable Laws."

18.     Pursuant to Section 5(a) of the Program Agreement, Freedom and MCS agreed that they would "at all times comply with the federal Equal Credit Opportunity Act ["ECOA"]

and its implementing Regulation B." Under Section 5(b), Freedom and MCS further agreed to deliver, in accordance with ECOA time limits, adverse action notices on behalf of BLM to Program applicants who did not meet BLM's minimum credit standards or were otherwise denied credit.

19.     Pursuant to Section 7(b)(6) of the Program Agreement, Freedom and MCS represented and warranted that their performance of the Program Agreement would "compl[y] in all material respects with all Applicable Laws."

20.     Pursuant to Section 8(d) of the Program Agreement, as added by the February 13, 2015 amendment, Freedom agreed that it "shall be solely responsible for complying with all Applicable Laws in connection with the solicitation, marketing, sale and financing of any goods and services pursuant to this Section 8, and in particular, any add-on products."

21.     The Program Agreement also provided for the sale of additional products and services ("add-on products") to customers for whom BLM originated loans under the Program. Specifically, Section 2(b) required Freedom and MCS to offer customers an optional debt waiver product ("Debt Waiver Product") during loan originations, for which customers were to have the option of paying in a single lump sum or in monthly installments.

22.     Section 8(a) of the Program Agreement gave Freedom and MCS the right to offer other add-on products to customers, "provided, however, that in the event that [Freedom or MCS] uses Bank's name and/or Proprietary Materials in connection with such offerings, [Freedom and MCS] shall obtain Bank's prior approval for such use."

23.     During the negotiations of the Program Agreement, no add-on products other than the Debt Waiver Product were discussed among BLM and Freedom.

24.     Through the course of an examination by the Federal Deposit Insurance Corporation ("FDIC"), BLM became aware of certain violations in the statutory disclosures Freedom and MCS provided to consumers obtaining loans under the Program and subject to the Program Agreement.

## COUNT I
## BREACH OF CONTRACT – Failure to Comply With Applicable Federal Law
### (Against Freedom and MCS)

25.     BLM re-alleges and incorporates by references paragraphs 1 through 24 as if fully stated herein

26.     From August 14, 2013 to September 11, 2015, Freedom and MCS provided loan origination services to BLM under the Program Agreement.

27.     In originating and servicing loans under the Program Agreement, Freedom and MCS engaged in practices that violated the Federal Trade Commission Act, including the following violations (the "FTCA Violations"):

a.     Freedom and MCS promoted and sold some loans as interest-free for six months.  Freedom advertised these loans as originated by BLM, however, BLM offered no interest-free loans under the Program Agreement.  Further, certain borrowers who paid off their loans within six months did not receive a refund of interest.

b.     Freedom and MCS failed to verbally disclose to consumers the annual percentage rates for loans offered over the phone.

c.     Freedom and MCS failed to fully disclose the terms of add-on products sold to consumers.

d.     Freedom sold to customers duplicate memberships with certain add-on products, including the United Motor Club ("UMC") and the Freedom Value Club

("FVC").  In addition, some UMC memberships were registered with BLM listed as the selling agency when, in fact, BLM never sold UMC memberships.

e.      Freedom and MCS advertised and sold the UMC and FVC add-on products to consumers using BLM's name and funding the memberships with the loan proceeds from BLM.  However, Freedom and MCS failed to obtain BLM's prior consent to sell the UMC and FVC memberships under BLM's name, as required by Section 8(a) of the Program Agreement.

f.      Freedom did not allow customers the opportunity to pay for the purchase of optional debt cancellation coverage for loans through monthly premium payments rather than a lump sum payment, despite that the contract language afforded customers the option of purchasing this product through monthly installment payments.  Further, Freedom underpaid refunds due to customers who paid off or refinanced loans within thirty (30) days.

28.     In originating and servicing loans under the Program Agreement, Freedom and MCS also failed to provide BLM borrowers obtaining loans under the Program the proper disclosures required by the Truth in Lending Act and its implementing Regulation Z, including the following violations (the "TILA Violations"):

a.      Freedom and MCS promoted credit terms that were not actually offered, including telephone scripts informing customers of 18-month interest-free financing available through BLM and advertisements informing customers of loans with zero (0) percent annual percentage rates.

b.      The scripts used by Freedom and MCS representatives when discussing potential loans through BLM with customers did not prompt the representative to state the required annual percentage rate.

c.      Freedom's and MCS's internet pages advertising credit financing through BLM for United States military, government, and civil service personnel failed to disclose the terms of payment.

29.      In originating and servicing loans under the Program Agreement, Freedom and MCS also failed to provide BLM borrowers obtaining loans under the Program the proper disclosures required by the Equal Credit Opportunity Act and its implementing Regulation B, including the following violations (the "ECOA Violations"):

a.      Freedom failed on behalf of BLM to send adverse actions to Program applicants who did not meet BLM's minimum credit standards or who were otherwise denied credit.

b.      The adverse action notices sent by MCS on behalf of BLM failed to make proper and compliant disclosures regarding BLM's regulatory agency.

30.      As a result of the FTCA, TILA, and ECOA Violations, the FDIC took adverse action against BLM, Freedom, and MCS.  In resolution of the proceedings, each entered into consent agreements with the FDIC, and were required to make restitution and pay civil penalties.

31.      The FTCA, TILA and ECOA Violations by Freedom and MCS constitute breaches of the Program Agreement.

32.      As a result of Freedom and MCS's breaches, BLM was subject to adverse action by the FDIC.  On May 10, 2017, the FDIC issued an order for restitution requiring BLM to make restitution to consumers injured by Freedom and MCS.  BLM was forced to expend significant

amounts of money in responding to the FDIC's action, mitigating the damage caused by Freedom and MCS, and making restitution.  Freedom and MCS also caused significant harm to BLM's reputation and a loss of good will.

33.     Pursuant to Section 12(b) of the Program Agreement, Freedom was required to indemnify BLM for any damages resulting from the FTCA, TILA, and ECOA Violations by Freedom and MCS.  This indemnity includes an obligation to pay BLM's actual reasonable attorneys' fees and costs.  Freedom breached the Program Agreement by failing to honor this indemnity by failing to pay BLM all fees and costs incurred by it as a result of Freedom's and MCS's FTCA, TILA, and ECOA Violations.

34.     BLM made a demand for indemnification on Freedom under Section 12(b) of the Program Agreement.  However, Freedom failed to honor this indemnity.  Instead, on August 15, 2017, John and Leonard Melley dissolved Freedom.

35.     As a result of Freedom's and MCS's breaches, BLM has been damaged in an amount to be determined at trial, but not less than $2,383,059.00.

## COUNT II
## BREACH OF CONTRACT – Failure to Honor Guaranty Agreements
### (Against John Melley and Leonard Melley)

36.     BLM re-alleges and incorporates by reference paragraphs 1-35 as if fully stated herein.

37.     In consideration and as further security for BLM's agreement to enter into and fund loans under the Program Agreement, John and Leonard Melley each executed a Guaranty Agreement.

38.     By the terms of the Guaranty Agreements, John and Leonard Melley agreed to guarantee "the full and prompt payment and performance . . . of any and all obligations of

[Freedom and MCS] under the [Program Agreement], and under any other agreement, document or instrument executed in connection therewith by [Freedom and MCS]."

39. By the terms of the Guaranty Agreements, John and Leonard Melley additionally agreed to pay all fees incurred by BLM in enforcing the Guaranty Agreements and in enforcing BLM's rights under the Program Agreement.

40. As alleged herein, Freedom and MCS failed to fully perform under the Program Agreement by committing the FTCA, TILA, and ECOA Violations and by failing to indemnify BLM from and against its losses resulting from these Violations.

41. John and Leonard Melley have breached the Guaranty Agreements by failing to honor the Guaranty Agreements by failing to ensure Freedom and MCS fully performed under the Program Agreement and by failing to pay BLM all of its losses arising from Freedom's and MCS's failure to perform under the Program Agreement.

42. As a result of John and Leonard Melley's breaches, BLM has been damaged in an amount to be determined at trial, but not less than $2,383,059.00.

## COUNT III
### BREACH OF CONTRACT – Failure to Comply with Applicable State Law
#### (Against Freedom and MCS)

43. BLM re-alleges and incorporates by reference paragraphs 1-42 as if stated fully herein.

44. Pursuant to Section 7(b) of the Program Agreement, Freedom and MCS each made the following representations and warranties:

   a. Freedom and MCS each "has full power and authority to execute, deliver, and perform its obligations under this Program Agreement;"

b.      "All approvals, authorizations, licenses, registrations, consents, and other actions by, notices to, and filings with, any Person that may be required in connection with the execution, delivery, and performance of this Program Agreement by [Freedom and MCS], have been obtained;" and

c.      "The execution, delivery and performance of this Program Agreement by Company complies in all material respects with all Applicable Laws."

45.      Under Colorado law, to engage in the business of making loans to Colorado consumers with finance charges that exceeds 12% per year, a person must first obtain a supervised lender's license from the Colorado Administrator of the Colorado Uniform Consumer Credit Code (the "UCCC Administrator").

46.      As Defendants asserted in their Counterclaims filed in this action, Freedom and MCS did not have the authority to sell to Colorado consumer loan products with finance charges exceeding 12% per year.

47.      In originating and servicing loans under the Program Agreement, Freedom and MCS promoted and sold to consumers in Colorado loans with finance charges that exceeded 12% without first obtaining a supervised lenders license from the Colorado UCCC Administrator.

48.      By failing to obtain a supervised lenders license from the Colorado UCCC Administrator, Freedom and MCS breached the Program Agreement by breaching the representations and warranties under Section 7(b).

49.      As a result of Freedom's and MCS's breaches, BLM has been damaged in an amount to be determined at trial.

## COUNT IV
## <u>MISREPRESENTATION: INTENTIONAL</u>
### (Against Freedom and MCS)

50.     BLM re-alleges and incorporates by reference paragraphs 1-49 as if stated fully herein.

51.     In negotiating and entering into the Program Agreement, Freedom and MCS each represented to BLM that, prior to entering into the agreement, they (a) had the full power and authority to perform their obligations under the Program Agreement; (b) had obtained all approvals, authorizations, licenses, registrations, consents, and other actions by, notices to, and filings with, any person that would be required in connection with the performance of the Program Agreement by Freedom and MCS; and (c) their performance of the Program Agreement would comply in all material respects with all applicable laws (collectively, the "Representations").

52.     Despite these prior Representations to BLM, in Defendants' Counterclaims filed in this action, Freedom and MCS asserted that they did not have the authority to contract for and receive from Colorado consumers finance charges exceeding 12%.

53.     Thus, Freedoms' and MCS' prior Representations were, according to Freedom and MCS, false when made.

54.     Freedom and MCS knew at the time they negotiated and entered into the Program Agreement that their Representations to BLM were false.  Freedom and MCS made the Representations either knowing they were false or in reckless disregard of whether true or not.

55.     Freedom and MCS made the false Representations with the intent to deceive BLM and to induce BLM to enter into the Program Agreement.

56.     At the time BLM entered into the Program Agreement, BLM was unaware that Freedom and MCS did not, as they now claim, have the authority to contract for and receive from Colorado consumers finance charges exceeding 12%.  Freedom and MCS knew BLM was unaware of this fact.

57.     Freedom's and MCS' false Representations were material to BLM's decision to enter into the Program Agreement, because, among other ways, the Representations assured BLM that the Program would comply with all applicable laws.

58.     BLM relied on Freedoms' and MCS' false Representations in deciding to enter into the Program Agreement and the amendments thereto.  Had BLM known that Freedom and MCS were not truthful in their Representations, BLM would not have entered into these agreements with Freedom and MCS.

59.     BLM has suffered, and may continue to suffer damages, as a direct and proximate result of Freedom's and MCS's intentional misrepresentations, in an amount to be determined at trial.

60.     Freedom and MCS acted with knowledge of BLM's reliance on their misrepresentations, their misrepresentations were intended to benefit Freedom and MCS at BLM's expense, and they made the representations willfully and in bad faith.  Accordingly, BLM is entitled to judgment awarding it compensatory and punitive damages against Freedom and MCS in amounts to be determined at trial.

## COUNT V
## MISREPRESENTATION: STRICT RESPONSIBILITY
### (Against Freedom and MCS)

61.     BLM re-alleges and incorporates by reference paragraphs 1 through 60 as if stated fully herein.

62.     In negotiating and entering into the Program Agreement, Freedom and MCS made the Representations to BLM.  These Representations were, according to Freedom and MCS, false when made.

63.     Freedom and MCS made these Representations to BLM based on their personal knowledge of their own authority to conduct business in Colorado.

64.     Freedom and MCS had economic interests in BLM entering into the Program Agreement, because, among other ways, Freedom and MCS received fees for their services and profited by using BLM's name, goodwill, and reputation.

65.     In reliance on Freedom's and MCS's false Representations, BLM made the decision to enter into the Program Agreement.

66.     BLM has suffered, and may continue to suffer damages, as a direct and proximate result of Freedom's and MCS's misrepresentations, in an amount to be determined at trial.

**COUNT VI**
**MISREPRESENTATION: NEGLIGENCE**
**(Against Freedom and MCS)**

67.     BLM re-alleges and incorporates by reference paragraphs 1 through 66 as if stated fully herein.

68.     In negotiating and entering into the Program Agreement, Freedom and MCS made the Representations to BLM.  These Representations were, according to Freedom and MCS, false when made.

69.     Freedom and MCS ought reasonably to have foreseen that misrepresenting to BLM that they had obtained all licenses necessary to perform under the Program Agreement, including supervised lender licenses from the Colorado UCCC Administrator, would subject BLM to the risk of loss.

14

70.     Believing Freedom's and MCS's Representations to be true, in reliance upon those Representations, BLM made the decision to enter into the Program Agreement.

71.     BLM has suffered, and may continue to suffer damages, as a direct and proximate result of Freedom's and MCS's misrepresentations, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bank of Lake Mills requests that this Court grant judgment against Defendants Freedom Stores, Inc., Military Credit Services, LLC, John F. Melley, and Leonard B. Melley, jointly and severally as follows:

(a)     Awarding of judgment for damages in an amount to be determined at trial, but not less than $2,383,059.00, together with pre-judgment interest;

(b)     Awarding of punitive damages, as reasonable and appropriate, in an amount to be determined at trial;

(c)     Awarding of statutory and contractual costs and reasonable attorneys' fees incurred in bringing this action and in remedying the Violations in an amount to be determined by the Court after a trial on the merits of BLM's claims; and

Awarding of such other relief as the Court may deem just and equitable.

Dated this 31st day of May, 2019.

GODFREY & KAHN, S.C.

By: *Electronically signed by Charles A. Gordon*
    John L. Kirtley
    State Bar No. 1011577
    Charles A. Gordon
    State Bar No. 1086536

*Attorneys for Plaintiff Bank of Lake Mills*

P.O. ADDRESS:
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
jkirtley@gklaw.com
cgordon@gklaw.com

16